UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>NAEEM DWAYNE FARLEY,<br>Defendant. | Case No. 18-cr-00400-TSH-1<br><br>**ORDER DENYING MOTIONS TO SUPPRESS**<br>Re: Dkt. Nos. 13, 15 |

## I.  INTRODUCTION

The events of this case span four days in March 2017, including a vehicle stop near the Legion of Honor on March 3, a car break-in at Baker Beach followed by a car chase through the Sea Cliff Area on March 4, and a post-arrest interrogation on March 6. Defendant Naeem Dwayne Farley is charged with two misdemeanors: (1) 36 C.F.R. § 4.2, assimilating California Vehicle Code section 2800.2(a) – Fleeing a Pursuing Police Officer (a Class A misdemeanor); and (2) 36 C.F.R. § 2.30(a)(5) – Misappropriation of Property (a Class B misdemeanor). He has filed two motions to suppress. In the first, he moves for an order suppressing statements elicited by police, arguing they violated his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). First Mot., ECF No. 13. In the second, he moves for an order suppressing all fruits of the search of his car, as well as statements made by him over the course of the March 3 stop, arguing it occurred without reasonable suspicion. Sec. Mot., ECF No. 15. The government opposed both motions in one opposition. ECF No. 24. Farley filed two replies. ECF Nos. 27 (*Miranda* Reply), 28 (March 3 Stop Reply). Having considered the parties' positions, relevant legal authority, and the record in this case, the Court **DENIES** Farley's motions for the reasons set forth below.

## II. BACKGROUND

**A. March 3, 2017**

On March 3, 2017, United States Park Police ("USPP") Officer Benjamin Kunzel "was notified via USPP dispatch of a suspicious individual looking into parked vehicles in front of the Cliff House Restaurant." Falk Decl., Ex. A (USPP Incident Report) at 2, ECF No. 16-1. "The subject, described as a black male, was said to be driving a silver four door Infiniti." *Id.* Officer Kunzel then drove "eastbound on El Camino Del Mar at 34th Avenue," when he "observed a silver four-door Infiniti with a black male driver leaving the parking area of the Legion of Honor." *Id.* Farley admits that he "was driving a silver Infiniti automobile, license plate 7PX115 on El Camino del Mar Drive near the Palace of the Legion of Honor." Farley Decl. ¶ 2, ECF No. 17.

Officer Kunzel reported that "[s]everal bystanders in the area looked at my patrol vehicle and pointed to the silver Infiniti." USPP Incident Report at 2; Oki Decl., Ex. 1 (Kunzel Decl.) ¶ 8, ECF No. 24-2 ("At least three individuals waived me down when I was near the parking lot. The individuals then all pointed to the silver Infiniti leaving the parking lot."). The parties agree that 41 seconds after the stop, Officer Kunzel radioed to dispatch that "someone pointed this car out to me as I was driving by it and it matched the description of the vehicle given out. I got the guys stopped." Kunzel Decl. ¶ 12; Falk Decl. ¶ 12. According to Officer Kunzel's report, he observed the "silver Infiniti, CA license plate 7PYX115, parked in the middle of a crosswalk on the side of the road on El Camino Del Mar at 34th Ave., at which point he "notified USPP dispatch that [he] was going to conduct a traffic stop on the Infiniti, and requested an additional unit." USPP Incident Report at 2.

According to Officer Kunzel, he then "activated the emergency equipment on my fully marked police cruiser and blocked the vehicle." USPP Incident Report at 2. According to Farley, he observed Officer Kunzel pull a U-turn after passing him, then "turned on his lights, signaling for [him] to stop." Farley Decl. ¶ 3. Farley states that he stopped when he saw the police lights. *Id.* ¶ 4. Officer Kunzel approached Farley's vehicle, at which point Farley handed him his vehicle keys and his California identification card. USPP Incident Report at 2. Officer Kunzel observed at least one window punch tool in the center console of the vehicle. *Id.*; Kunzel Decl. ¶ 14. He

2

states that in his "training and experience these tools are often used to break into vehicles." USPP Incident Report at 2. He also states in his report that "[t]he area FARLEY was driving in also has a high rate of larceny from auto crimes." *Id.*

Officer Kunzel checked Farley through USPP Communications, which "returned negative for wants or warrants, but indicated several felony contacts and a prior charge for felony gun possession. The return also indicated that FARLEY was unlicensed." *Id.* Officer Kunzel reported that several San Francisco Police Department units arrived on scene and "advised they had been given a lookout matching the driver and vehicle [he] had stopped." *Id.* Officer Kunzel removed Farley from the vehicle and detained him. *Id.* He then searched the vehicle and retrieved two window punch tools. *Id.* Officer Kunzel reported that Farley stated the tools "were survival tools, and that he had not broken into any vehicles." *Id.* Officer Kunzel also reported that he "observed several small pieces of shattered glass scattered around the floor board of the vehicle," and that in his experience, "small pieces of shattered glass are typically found in larceny from auto suspect vehicles." *Id.* Officer Kunzel also located a Certificate of Title to another vehicle, a 2003 Toyota, CA license plate 6SHA144. The title indicated the vehicle was registered to "Yusuf SAAD." *Id.* Officer Kunzel also observed documents in a folder with Farley's name on it. Kunzel Decl. ¶ 19.

Officer Kunzel reported that Farley stated, "he had recently purchased the vehicle, but was unable to provide any proof of sale." USPP Incident Report at 2. Officer Kunzel located a State of California Certificate of Title that indicated Hilda WALDMAN was the registered owner of the vehicle." *Id.* He reported that "Sgt. SWEET-BUDD provided permission to have the vehicle impounded due to an unlicensed driver and no proof of ownership." *Id.* When a car is to be impounded, it is common practice for the USPP to go through the car to look for valuables in order for those valuable to be accounted for on the impound sheet. Hall Decl. ¶ 6. Officer Hall assisted in the search of the silver Infiniti prior to the tow truck company's arrival to impound the Infiniti and during the search noticed some paperwork with Farley's name on it. *Id.* Farley was allowed to remove the paperwork from the car prior to the tow. *Id.* A tow truck arrived on scene and towed the Infiniti, after which Farley was issued a citation "for possession of burglary tools (PC 466), tampering 0,/C 10852), and unlicensed driver 0,/C 12500 (a})." USPP Incident Report

3

at 2. Farley was released on scene. *Id.*

**B.     March 4, 2017**

On March 4, 2017, Officer Nielsen of the USPP was patrolling the Baker Beach parking lot and was flagged down by a tourist who stated that her vehicle had been broken into and her purse stolen. Opp'n at 1. Officer Nielsen spotted a white BMW with heavily tinted windows exiting the parking lot and turned his vehicle around to follow the BMW. *Id.* He observed the BMW pass a stop sign without stopping. *Id.* Officer Nielsen activated his emergency lights and sirens to effectuate a traffic stop of the BMW, at which point the driver accelerated, ran through two additional stop signs, and swerved into on-coming traffic to pass two vehicles, including a Muni bus. *Id.* at 1-2; First Mot. at 2. Officer Nielsen lost sight of the vehicle at El Camino Del Mar and 25th Avenue, but subsequently located the BMW with its airbags deployed in the middle of 26th Avenue between El Camino Del Mar and Lake Street. Opp'n at 2. Officer Nielsen pulled within five feet of the vehicle and witnessed only one person, the driver, flee the scene and run south on the east sidewalk of 26th Avenue toward Lake Street. *Id.*; First Mot. at 2. Officer Nielsen did not pursue the suspect on foot, and the suspect was not apprehended on March 4. Opp'n at 2. Officer Nielsen subsequently searched the car and found Farley's tax returns inside. *Id.* Officer Hall states he later recognized the documents as the same ones Farley was allowed to take from the silver Infiniti the day prior. Hall Decl. ¶ 7. In addition, Officer Nielsen found documents, a cell phone, and a driver's license in the name of Lewis McFadden. Opp'n at 2; First Mot. at 2. In a subsequent lineup, an eyewitness identified McFadden as the man who had crashed the BMW and fled from the officers. First Mot. at 2.

On March 5, Officer Nielsen completed his report and obtained a California driver's license photo based on the personal information from the tax return documents found in the BMW. Opp'n at 2. Officer Nielsen positively identified the driver of the BMW that fled from the scene as Farley. *Id.*

**C.     March 6, 2017**

On March 6, 2017, Farley went to the USPP station at 1217 Ralston Avenue in San Francisco "to retrieve his car, an Infinity, which the park police had impounded previously." First

4

Mot. at 2; Leonida Decl., Ex. A (Suppl. Crim. Incident Report) at 1, ECF No. 14-1. When Officer Nielsen pulled into the parking lot that day, he noticed Farley sitting in the front seat of a parked car. Opp'n at 2. He arrested Farley for "possession of stolen property and fleeing." Suppl. Crim. Incident Report at 1. Farley was taken into custody and advised of his *Miranda* rights. *Id.* He initially agreed to talk to the detective and answered questions about his whereabouts on March 4, 2017. First Mot. at 2, Suppl. Crim. Incident Report at 1.

Detective Lopez reported that Farley explained that he had been at his grandmother's house in Oakland and disavowed any knowledge of the BMW involved in the chase two days earlier. Suppl. Crim. Incident Report at 1. His report also indicates that, when he asked Farley to provide his grandmother's telephone number for verification, Farley "got i[m]patient and argumentative," and "was being evasive with my questioning." *Id.* The report also indicates that Detective Lopez "asked him if he knew a person named Waldoff (registered owner of the Infinity that was towed on Friday.)," and that Farley "acknowledged that was the former owner's vehicle that his friend bought in which he bought it off of his friend." *Id.*

According to the report, the investigator told Farley "that an officer saw him running from the BMW" and that Farley responded "that I 'know that you're lying.'" *Id.* When the investigator said there "were items found in the BMW that belonged to him (i.e. paperwork with his name on it)," Farley said "he never bought a BMW or has even been in one." *Id.* The report indicates Farley "was unable explain [sic] why his items were in the vehicle." *Id.*

When Detective Lopez "reinitiated the questioning about his whereabouts on Saturday," the report indicates Farley said, "'It was not going in his favor' and 'put me back in the cell.'" *Id.* The investigator "explained to him that I am there trying to help him by sorting out all the facts" and "asked him again why his paperwork was inside the BMW." *Id.* Farley responded that he "was not driving that car." *Id.* When the investigator said, "but he was in that BMW," Farley responded, "Man I was not in that BMW on Saturday." *Id.* When the investigator asked him "who's [sic] BMW was he in," Farley "hesitated and repeated the question back to me. He responded, 'See I am not the type of person to tattle-tale or tell on nothing so I'm not going to say whose BMW I was in.'" *Id.* He said he "was willing to take fall," but the investigator "obviously

5

know[s] that he was not in the vehicle." *Id.*

### III. DISCUSSION

**A.  Motion to Suppress – Interrogation**

Farley argues he "was unambiguous in his attempt to terminate his interrogation. In fact, he announced that he would rather go back to a jail cell than continue answering the officer's questions." First Mot. at 3. He maintains the officer's "refusal to honor his request was a blatant violation of *Miranda* and requires suppression of any statements elicited from [him] after he asked to be taken back to his cell." *Id.*

In response, the government argues Farley failed to unambiguously invoke his right to silence because his statements do not clearly indicate that he wanted to end the conversation and, throughout the interrogation, Farley "expressed a willingness to make his case; this willingness and desire did not change after he uttered the statements at issue here." Opp'n at 10. The government further argues that the totality of the circumstances supports a finding that Farley's statements were ambiguous because Detective Lopez indicated he "was evasive the entire interview," and "he had his arms crossed and was slouched over the entire time." *Id.* (citing Oki Decl., Ex. 3 (Lopez Decl.) ¶ 6, ECF No. 24-4). The government argues his "demeanor did not change in any way after he made these statements." *Id.*

**1.  Legal Standard**

The Fifth Amendment privilege against self-incrimination provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Before officers can ask questions of a person in custody, they must advise him that he

> has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda*, 384 U.S. at 478-79. "The fundamental purpose of the court's decision in *Miranda* was 'to assure that *the individual's right to choose* between speech and silence remains unfettered throughout the interrogation process.'" *Connecticut v. Barrett*, 479 U.S. 523, 528 (1987) (quoting *Miranda*, 384 U.S. at 469 (emphasis added in *Barrett*)). "When a suspect invokes his right to

silence, the officers' interrogation must cease. Period." *Jones v. Harrington*, 829 F.3d 1128, 1132 (9th Cir. 2016).

Nevertheless, a defendant may waive his rights under *Miranda*. 384 U.S. at 444; *Colorado v. Spring*, 479 U.S. 564, 566, 572-73 (1987). The government bears the burden of proving by a preponderance of the evidence that a criminal defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights. *Miranda*, 384 U.S. at 444; *Missouri v. Seibert*, 542 U.S. 600, 608, n.1 (2004). The Court must assess the voluntariness of an admission under the "'totality of all the circumstances—both the characteristics of the accused and the details of the interrogation.'" *Mickey v. Ayers*, 606 F.3d 1223, 1233 (9th Cir. 2010) (citing *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). In determining whether a statement is voluntarily made, "the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." *Oregon v. Elstad*, 470 U.S. 298, 318 (1985).

### 2. Application to the Case at Bar

In this case, Farley does not argue that the *Miranda* warning was insufficient or that his waiver was involuntary; he admits he "initially agreed to talk to the officer and answered questions about his whereabouts." First Mot. at 2; *see also* Lopez Decl., Ex. B (Miranda Card signed by Farley in which he agreed to cooperate with the police and provide a statement to Detective Lopez without a lawyer). Thus, the question is whether he properly invoked his *Miranda* rights by stating things were "not going in [his] favor" and "put me back in the cell."

Although the Supreme Court has not addressed ambiguous statements in the context of the right to remain silent under *Miranda*, it has in the context of the right to counsel. In *Davis v. United States*, the Court held that if a suspect waives his *Miranda* rights and proceeds with an unassisted interrogation, he must thereafter "unambiguously request counsel" to restore his right to have an attorney present during the interrogation. 512 U.S. 452, 459, 461 (1994). This means that the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 459. Where there has been only an equivocal or ambiguous assertion of the right to counsel

7

in that context, the attending officer may ask questions to clarify the defendant's wishes but is not required to do so and may simply "continue questioning until and unless the suspect clearly requests an attorney." *Id.* at 461.

The Supreme Court has not applied the *Davis* standard to require an unequivocal invocation in the right to remain silent context. *DeWeaver v. Runnels*, 556 F.3d 995, 1000-01 (9th Cir. 2009); *see also James v. Marshall*, 322 F.3d 103, 108 (1st Cir. 2003). The Ninth Circuit has also "declined to decide whether the *Davis* requirement of a clear and unequivocal invocation applies to the right to remain silent." *DeWeaver*, 556 F.3d at 1001 (noting that since the Court's decision in *Davis*, "many state and federal courts have extended its rule and required suspects to unambiguously invoke the right to remain silent before police must halt an interrogation," but declining to do so because "[t]he question before us is not whether the *Davis* rule applies to an invocation of the right to remain silent, but whether the state appellate court contravened Supreme Court precedent by applying it in that manner."). Thus, the Court must look to the totality of the circumstances to determine whether Farley's statements invoked his right to silence.

This case is similar to the situation that confronted the Court of Appeals in *DeWeaver*. After advising DeWeaver of his *Miranda* rights, officers started to discuss in detail the shootings they were investigating. *DeWeaver*, 556 F.3d at 999. DeWeaver became "upset" and "asked to be returned to the jail." *Id.* One of the officers asked DeWeaver to "hear him out." *Id.* DeWeaver then continued to talk with the officers. *Id.* The state court held that "asking to be taken back to jail did not evidence a refusal to talk further." *Id.* at 1002 (internal citation omitted). To make this determination, the state court relied upon several factors: DeWeaver said nothing about ending the interrogation or not wanting to talk with officers, the officers were aware that DeWeaver knew how to invoke his right to remain silent because he had done so earlier, and the officers clearly did not consider DeWeaver to be invoking his right to silence. *Id.* The court held that the state court decision was not an unreasonable application of federal law because the court "could properly conclude from these facts that a reasonable officer in the circumstances would not have understood DeWeaver's request to be an invocation of the right to silence." *Id.* (citing *Davis*, 512 U.S. at 459).

8

Here, too, Detective Lopez knew Farley understood his right to remain silent, yet he waived this right and agreed to talk. During the interrogation, Farley never expressly said he wanted to end the interrogation or that he did not want to talk. Further, Detective Lopez indicated Farley was impatient and argumentative and was being evasive with questioning earlier in the interrogation. Given Farley's demeanor throughout the interrogation, there is no indication that a reasonable officer would understand his statements that the interrogation "was not going in his favor" and "put me back in the cell" were an invocation of the right to silence. Further, when looking at the statements alone, they are ambiguous – it is clear Farley was frustrated with the direction of the interrogation, but it is not clear that he invoked his right to silence.

Farley cites *Arnold v. Runnels*, 421 F.3d 859, 865 (9th Cir. 2005), arguing "neither the Supreme Court nor the United States Court of Appeals for the Ninth Circuit has required that a suspect seeking to invoke his right to silence provide any statement more explicit or more technically-worded than 'I have nothing to say.'" First Mot. at 3. In *Arnold*, the defendant stated that he did not want to talk on tape and then followed with numerous "No comment" answers. 421 F.3d at 864. The court held Arnold's statement that he did not want to talk on tape was neither ambiguous nor equivocal and therefore held that the admission of any subsequent statements was a violation of his Fifth Amendment rights. *Id.* at 866. Here, Farley never said he did not want to talk or "no comment." His statements that the interrogation "was not going in his favor" and "put me back in the cell" are more ambiguous, and they fall squarely within the context of the Ninth Circuit's decision in *DeWeaver*, where the defendant also requested to be returned to his cell. As the Ninth Circuit has found that a reasonable officer in such circumstances would not understand such a request to be an invocation of the right to silence, the Court finds *DeWeaver* and not *Arnold* provides the appropriate standard to follow here.

**3.   Conclusion**

Given the totality of the circumstances, the Court cannot say that a reasonable officer in the circumstances would have understood Farley's statements to be an invocation of the right to silence. Accordingly, his first motion to suppress must be denied.

**B.     Motion to Suppress – Investigatory Stop**

In his second motion, Farley argues the March 3, 2017 stop and subsequent search were conducted without the requisite reasonable suspicion, and that "all fruits of the Fourth Amendment violation" must therefore be suppressed. Sec. Mot. at 7.

**1.     Legal Standard**

The Fourth Amendment protects citizens from unreasonable searches and seizures. U.S. Const. amend. IV. However, "[t]he Fourth Amendment permits brief investigative stops . . . when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396 (2014) (citations and quotation marks omitted). In order to conduct an investigatory stop, the Fourth Amendment requires only that a police officer have "reasonable suspicion to believe that criminal activity 'may be afoot.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)); *see also Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) ("[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.") (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). "Reasonable suspicion" is not a particularly high threshold to meet. *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013). It "'is a less demanding standard than probable cause,' and merely requires 'a minimal level of objective justification.'" *Gallegos v. City of Los Angeles*, 308 F.3d 987, 990 (9th Cir. 2002) (citing *Wardlow*, 528 U.S. at 123); *Navarette*, 572 U.S. at 397 ("Although a mere hunch does not create reasonable suspicion, . . . the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause."). Courts must assess "the totality of the circumstances," permitting officers to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Valdes-Vega*, 738 F.3d at 1078 (quoting *Arvizu*, 534 U.S. at 273); *Navarette*, 572 U.S. at 397.

"The burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement is on the government." *United States v. Scott*, 705 F.3d 410, 416 (9th Cir.

2012) (citing *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001)). Where searches and seizures violate Fourth Amendment protections, the exclusionary rule prohibits unlawful evidence obtained as a direct or indirect result of such invasions and is considered "fruit of the poisonous tree." *Segura v. United States*, 468 U.S. 796, 804 (1984); *United States v. McClendon*, 713 F.3d 1211, 1215 (9th Cir. 2013). Such evidence is also inadmissible against a criminal defendant and should be suppressed where the government's illegal search is the but-for cause of the evidence's discovery. *McClendon*, 713 F.3d at 1218 (citing *Segura*, 468 U.S. at 815).

**2. Application to the Case at Bar**

**a. Investigatory Stop**

Here, the Court finds Officer Kunzel had reasonable suspicion to conduct an investigatory stop of Farley. While on patrol, Officer Kunzel heard the USPP dispatch to be on the lookout for a suspicious individual who had been looking into parked cars in front of the Cliff House restaurant. Dispatch described a black male driving a silver four-door Infiniti. Kunzel Decl. ¶ 6. When Officer Kunzel arrived at the Legion of Honor parking lot, he observed a silver four door Infiniti with a driver that matched the description of the dispatch. Kunzel Decl. ¶ 7; USPP Incident Report at 2. Officer Kunzel states he knew that "[t]he area FARLEY was driving in also has a high rate of larceny from auto crimes." USPP Incident Report at 2. As he approached the area, at least three individual bystanders pointed at the silver Infiniti leaving the parking lot. Kunzel Decl. ¶ 8; USPP Incident Report at 2. The parties agree that 41 seconds after the stop, Officer Kunzel radioed to dispatch that "someone pointed this car out to me as I was driving by it and it matched the description of the vehicle given out. I got the guys stopped." Kunzel Decl. ¶ 12; Falk Decl. ¶ 12. These specific, articulable facts – the combination of the matching dispatch description regarding a suspicious individual looking into parked vehicles, Officer Kunzel's knowledge of the area having a high rate of larceny from auto crimes, and the individuals pointing to the silver Infiniti – provide the minimal level of objective justification necessary to support a finding of reasonable suspicion. *See United States v. Mayo*, 394 F.3d 1271, 1275, 1276 (9th Cir. 2005) (affirming district court's denial of defendant's motion to suppress where witness reported potential narcotics activity and dispatcher subsequently informed officer that he should

11

"investigate suspicious narcotics activity," holding that "this detention and its limited extension was supported by reasonable suspicion, based on specific, articulable facts, that Mayo was engaging in criminal activity.").

Farley argues the stop lacked reasonable suspicion because the justification was founded in an anonymous tip. Sec. Mot. at 8-13. "[A]n anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." *Florida v. J.L.*, 529 U.S. 266, 269 (2000). As a preliminary matter, it is not clear that the tip here was from an anonymous source. The government argues it was not. Opp'n at 4. However, as neither side has provided confirmation of the source of the tip, the Court shall assume it is anonymous for purposes of the present motion. "[U]nder appropriate circumstances, an anonymous tip can demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop.'" *Navarette*, 572 U.S. at 397 (quoting *Alabama v. White*, 496 U.S. 325, 327, 329 (1990)). Here, after Officer Kunzel received the dispatch, he observed a silver Infiniti that matched the description of the dispatch. But he did not initiate the investigatory stop based on this information alone; instead, at least three bystanders pointed out the silver Infiniti to him as it left the parking lot. The fact that three bystanders appeared to corroborate the original dispatch call leads significant support to the tip's reliability. Further, Officer Kunzel knew the area has a high rate of larceny from auto crimes. Thus, even if the person that originally reported the tip did so anonymously, Officer Kunzel properly drew on his own experience to infer from the cumulative information available to him before making the stop. *Valdes-Vega*, 738 F.3d at 1078. In looking at the totality of the circumstances, the Court finds that the specific and articulable facts in this case provide the reasonable suspicion necessary to effectuate a stop. *See Gates*, 462 U.S. at 234 ("[An informant's] explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles [a] tip to greater weight than might otherwise be the case."); *Navarette*, 572 U.S. at 399 (a claim of eyewitness knowledge as the basis of knowledge "lends significant support to the tip's reliability); *White*, 496 U.S. at 332 (although tip alone would not have justified a stop, police officers gained the necessary reasonable suspicion after their observations

corroborated the tipster's complaint).[1]

Thus, Officer Kunzel had the reasonable suspicion necessary to effectuate a stop of the Farley's silver Infiniti.[2]

### b. Search

Further, police may search an automobile and the containers within it without a search warrant when they have probable cause to believe it contains contraband or evidence of criminal activity. *California v. Acevedo*, 500 U.S. 565, 580 (1991); *United States v. Ross*, 456 U.S. 798, 804-09 (1982). A search of an automobile pursuant to the automobile exception to the warrant requirement is justified due to the inherent mobility of the vehicle, *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996); *United States v. Chadwick*, 433 U.S. 1, 12 (1977), and because of a reduced expectation of privacy. *California v. Carney*, 471 U.S. 386, 392 (1985).

Here, the Court finds Officer Kunsel had probable cause to believe the silver Infiniti contained contraband or evidence of criminal activity existed. After the initial stop, Officer Kunzel observed a window punch tool in the center console of the vehicle, which he knew from his training and experience was a tool that is often used to break into vehicles. USPP Incident Report at 2; Kunzel Decl. ¶ 14. Additionally, Officer Kunzel states that Farley said to him, "I am not breaking into cars. You probably think I was going to break into a car." *Id.* (both). Officer Kunzel then learned that Farley did not have a driver's license, he was not the registered owner of the vehicle, and he had an advisory for carrying a loaded stolen handgun and had 23 felony contacts and 5 misdemeanor contacts. USPP Incident Report at 2; Kunzel Decl. ¶¶ 13, 15, 16;

---

[1] Farley also argues the stop was improper because the tip was about a suspicious driver in a silver Infiniti near the Cliff House, but Officer Kunzel stopped him at the Legion of Honor – "*a full 1.6 miles away from the Cliff House*." March 3 Stop Reply at 2 (emphasis in original). However, the Court's Google Maps search shows that it takes five minutes to drive from the Cliff House to the Legion of Honor. *See United States v. Perea-Rey*, 680 F.3d 1179, 1182 n.1 (9th Cir. 2012) (taking judicial notice of Google's maps and satellite images as a source whose accuracy cannot be reasonably be questioned); *Crandall v. Starbucks Corp.*, 249 F. Supp. 3d 1087, 1099 (N.D. Cal. 2017) (recognizing that courts have taken judicial notice of facts gleaned from internet mapping tools such as Google Maps) (citation and quotations omitted). Given the facts above, the Court finds that the short drive from the Cliff House to the Legion of Honor does not change the result.

[2] As Officer Kunzel had reasonable suspicion, the Court need not consider the parties' arguments regarding the crosswalk traffic stop. And, because Farley's request for an evidentiary hearing is based on the government's reliance on Officer Kunzel's assertion that he was parked in a crosswalk, the Court denies his request as moot.

13

Falk Decl., Ex. D ("SF HIST DANGER POT WEAPON… 23 F 5 M…SUSP/REVK.").
Considering the totality of the circumstances, these facts support a finding that there was probable cause to suspect that Farley was engaged in criminal activity and that the silver Infiniti contained contraband and evidence of criminal activity. *See Gates*, 462 U.S. at 238 (probable cause determined by the totality of the circumstances).

Accordingly, Farley's second motion to suppress must be denied.

## IV. CONCLUSION

For the reasons stated above, the Court **DENIES** Farley's motions to suppress.

**IT IS SO ORDERED.**

Dated: March 18, 2019

THOMAS S. HIXSON
United States Magistrate Judge